# In the United States Court of Federal Claims

No. 12-836 L

(E-Filed: August 29, 2013)

| | |
|---|---|
| SHINNECOCK INDIAN NATION, | ) Court Lacks Jurisdiction over Claims |
| | ) by Federally Recognized Indian Tribe |
| Plaintiff, | ) for Denial of Effective Redress in |
| | ) Federal Courts; Amendment of |
| v. | ) Pleadings; Judicial Takings Claim |
| | ) Fails to State a Claim upon Which |
| THE UNITED STATES, | ) Relief Can Be Granted |
| | ) |
| Defendant. | ) |
| | ) |

Steven J. Bloxham, Sacramento, CA, for plaintiff. John M. Peebles and Darcie L. Houck, Sacramento, CA, of counsel.

Maureen E. Rudolph, with whom was Ignacia S. Moreno, Assistant Attorney General, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Chief Judge

The Shinnecock Indian Nation (the Shinnecock Nation or plaintiff), is a federally recognized Indian tribe whose historical territory included the area that is now the town of Southampton, New York. Compl., Docket Number (Dkt. No.) 1, ¶¶ 9, 11.[1] In this action, plaintiff asserts that the United States (the government or defendant), acting through the federal court system, has "denied any and all judicial means of effective redress for the unlawful taking of lands from Plaintiff and its members." Id. ¶ 5. Plaintiff asserts two claims for relief: (1) based on the government's alleged trust obligations to the plaintiff, id. ¶¶ 57-62 (claim one), and (2) based on federal common law (specifically, on international law norms that plaintiff contends are incorporated into

---

[1]The Complaint, Docket Number (Dkt. No.) 1, is organized into numbered paragraphs. Because the numbering of the paragraphs begins again in the "Prayer for Relief" section of the Complaint, the court cites this section of the Complaint by page number.

federal common law), id. ¶¶ 63-67 (claim two); see also infra Part III.A-B (discussing plaintiff's claims for relief).

Defendant has moved to dismiss plaintiff's claims, contending that they are not ripe and are not otherwise within the court's jurisdiction. See United States' Mot. to Dismiss & Mem. in Supp. (defendant's Motion or Def.'s Mot.), Dkt. No. 7, at 1-2. Defendant also contends that plaintiff should not be granted leave to amend its Complaint as requested to add a third claim for relief--which would characterize the government's actions as a "judicial taking"--because such an amendment would be futile. See infra Part III.C.

Before the court are:  defendant's Motion, filed February 19, 2013; Plaintiff's Memorandum in Opposition to United States' Motion to Dismiss (Pl.'s Resp.), Dkt. No. 10, filed April 22, 2013; and United States' Reply in Support of Motion to Dismiss (Def.'s Reply), Dkt. No. 13, filed May 16, 2013.

I.      Background

        A.      The Nonintercourse Act

In 1790 Congress enacted the first Indian Trade and Intercourse Act (the Nonintercourse Act), which, among other things, "bars sales of tribal land without the acquiescence of the Federal Government." City of Sherrill v. Oneida Indian Nation of N.Y. (City of Sherrill), 544 U.S. 197, 204 (2005); see also Nonintercourse Act, ch. 33, § 4, 1 Stat. 137, 138 (codified in relevant part, as amended, at 25 U.S.C. § 177 (2006)). The Nonintercourse Act "remain[s] substantially in force today." City of Sherrill, 544 U.S. at 204.  In its current form, it provides, in relevant part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.  Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000.

25 U.S.C. § 177.

        B.      The Conveyance of Plaintiff's Land and Plaintiff's Early Attempts to
                Challenge the Conveyance

On or about March 16, 1859 the state of New York enacted legislation that permitted a group of trustees to convey land belonging to the Shinnecock Nation to others.  Compl. ¶ 33.  On or about April 21, 1859 the trustees conveyed title to "a

2

substantial portion" of plaintiff's land--approximately 4,422 of 5,258 acres--to the town of Southampton. Id. ¶¶ 13, 16-17, 34. Although the trustees purported to act on its behalf, the Shinnecock Nation itself did not authorize or ratify the conveyance and was not a party to the agreement. Id. ¶¶ 33-34.

On or about July 25, 1859 members of the Shinnecock Nation filed suit to challenge the conveyance in state court. Id. ¶ 35. Other members of the Shinnecock Nation may have filed additional suits. Id. However, each of these actions was dismissed on the ground that such an action could not be brought by a tribe or its members.[2] See id.

C.     Plaintiff's Current Attempt to Challenge the Conveyance:  The District Court Litigation

According to plaintiff's allegations, plaintiff remained barred from challenging the conveyance of its land until relatively recently.  Specifically, plaintiff states that from the time of the conveyance of its land until approximately "December 23, 1987, Indian tribes in New York State were unable to prosecute lawsuits in their tribal names in the courts of the State . . . without the express consent of the New York State legislature." Id. ¶ 36. Additionally, plaintiff claims, until approximately "January 21, 1974, the courts of the United States were closed to the [Shinnecock] Nation and its individual tribal members for claims of violations of the Indian Non-Intercourse Act." Id. ¶ 39.

The court understands plaintiff's mention of the date January 21, 1974 to be a reference to the decision of the United States Supreme Court (Supreme Court) in Oneida Indian Nation of N.Y. v. Cnty. of Oneida (Oneida I), 414 U.S. 661 (1974), which was filed on that day.  In Oneida I, the Oneida Indian Nation of New York and the Oneida Nation of Wisconsin (each or collectively, the Oneidas), relying on the Nonintercourse Act, sought to invalidate the sale of certain land by the Oneidas in 1795 to the state of New York. Oneida I, 414 U.S. at 663-65.  The Oneidas sought damages equal to "the fair rental value of the land for the period January 1, 1968, through December 31, 1969." Id. at 665.  Construing the case as "essentially a possessory action," id. at 666, the Supreme Court found that the Oneidas' claims arose under federal law and could be brought in federal courts, see id. at 678, 682.  Following a trial on remand, the plaintiffs were awarded damages equal to the fair rental value of the land during the two-year period

---

[2]Because copies of the relevant decisions have not been provided to the court, this description is drawn from the allegations made by the Shinnecock Indian Nation (the Shinnecock Nation or plaintiff) in the Complaint.  Specifically, plaintiff alleges that the suits were dismissed on the following grounds:  (1) the Shinnecock Nation and its members were not natural persons; (2) the Shinnecock Nation and its members were not citizens; (3) the Shinnecock Nation could not bring such an action in its own name; and/or (4) the Shinnecock Nation's members could not bring such an action asserting the Shinnecock Nation's rights.  Compl. ¶ 35.

they had specified.  Cnty. of Oneida v. Oneida Indian Nation of N.Y.  (Oneida II), 470
U.S. 226, 230 (1985).  The Supreme Court upheld the damages award, stating:

> One would have thought that claims dating back for more than a century
> and a half would have been barred long ago. As our opinion indicates,
> however, neither petitioners nor we have found any applicable statute of
> limitations or other relevant legal basis for holding that the Oneidas' claims
> are barred or otherwise have been satisfied.

Id. at 253.  However, the court "express[ed] no opinion" as to "whether equitable
considerations should limit the relief available" to the Oneidas.  Id. at 253 n.27.

On or about June 15, 2005 plaintiff filed suit in the United States District Court for
the Eastern District of New York (the district court) against the state of New York,
among others, "seeking to vindicate the [Shinnecock] Nation's rights" to the 4,422 acres
of land conveyed to the town of Southampton (the district court litigation).  See Compl.
¶¶ 16-17, 46.  Specifically, plaintiff sought damages "for the period from 1859 to present,
a declaration that the [Shinnecock] Nation has possessory rights to the [conveyed lands],
immediate ejectment of all defendants from the lands, and other declaratory and
injunctive relief as necessary to restore the [Shinnecock] Nation to possession of the
lands."  Shinnecock Indian Nation v. New York (Dist. Ct. Op.), No. 05-CV-2887 (TCP),
slip op. at 2 (E.D.N.Y. Nov. 28, 2006), Dkt. No. 33.  Like the Oneidas, plaintiff based its
claims on the Nonintercourse Act.  See id.

D.     The City of Sherrill and Cayuga Decisions

While the district court litigation was pending, two decisions unfavorable to
plaintiff's claims and binding on the district court were issued in other cases.  Both
decisions addressed the availability of equitable defenses to Nonintercourse Act claims.
The first decision, City of Sherrill, concerned several parcels of land that had been part of
the Oneida reservation until 1805 and that were subsequently repurchased by the Oneidas
in 1997 and 1998.  City of Sherrill, 544 U.S. at 202.  The Oneidas sought to avoid paying
taxes to the city of Sherrill, New York on the purchased property "on the ground that [the
Oneidas'] acquisition of fee title . . . revived the Oneidas' ancient sovereignty piecemeal
over each parcel."  Id.  A corollary of the Oneidas' argument was that "regulatory
authority over [the Oneidas'] newly purchased properties no longer reside[d] in Sherrill."
Id.

In the Oneida II case, the Supreme Court had reserved the question of "whether
equitable considerations should limit the relief available" for Nonintercourse Act claims.
See Oneida II, 470 U.S. at 253 n.27.  The Court addressed this question in City of
Sherrill, holding "that standards of federal Indian law and federal equity practice preclude
the [Oneidas] from rekindling embers of sovereignty that long ago grew cold."  City of
Sherrill, 544 U.S. at 214 (internal quotation marks omitted).  The Court noted that the

land at issue had increased substantially in value, id. at 215, and had been under the sovereign control of the state, its counties and municipalities for nearly two centuries, id. at 216, during which time it had become "overwhelmingly populated by non-Indians," id. at 219.  Although the Court left its ruling in Oneida II--which concerned damages for the Oneidas' dispossession--intact, it concluded that "the Oneidas' long delay in seeking equitable relief . . . and developments in the City of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate." Id. at 221.

The plaintiffs in the second decision sought relief pursuant to the Nonintercourse Act including ejection of all defendants and damages for trespass.  See Cayuga Indian Nation of N.Y. v. Pataki (Cayuga), 413 F.3d 266, 269-70 (2d Cir. 2005).  Relying on City of Sherrill, the United States Court of Appeals for the Second Circuit (Second Circuit) "conclude[d] that the possessory land claim alleged [in Cayuga] is the type of claim to which a laches defense can be applied." Id. at 268.  Applying the district court's findings of fact to determine that the doctrine of laches barred the plaintiffs' claims, the Second Circuit ruled for the defendants. Id.

E.      Dismissal of the District Court Litigation and Commencement of this Action

In plaintiff's district court litigation, the district court found that "pragmatic concerns" of the type discussed in the City of Sherrill and Cayuga decisions "permeate here and warrant dismissal based on equitable considerations, including laches." Dist. Ct. Op. 2 (internal quotation marks omitted).  The district court noted that the Shinnecock Nation had not occupied the relevant land since 1859, that more than 140 years had passed since its alleged dispossession and that only .2% of county residents were of Native American descent. Id. at 10.  It also noted that the Shinnecock Nation sought relief similar to the relief sought in Cayuga. Id.  "To be sure," the district court stated, "the wrongs about which the Shinnecocks complain are grave, but they are also not of recent vintage, and the disruptive nature of the claims that seek to redress these wrongs tips the equity scale in favor of dismissal." Id. at 12.  Plaintiff filed a motion for reconsideration and an appeal of the district court's dismissal of its claims, both of which remain pending. See Notice of Mot. for Recons., Shinnecock Indian Nation v. New York, No. 05-CV-2887 (TCP) (E.D.N.Y. Dec. 19, 2006), Dkt. No. 36 (requesting reconsideration); Notice of Appeal, Shinnecock Indian Nation v. New York, No. 05-CV-2887 (TCP) (E.D.N.Y. Dec. 29, 2006), Dkt. No. 37; Order of June 6, 2013 at 3, Shinnecock Indian Nation v. New York, No. 05-CV-2887 (TCP) (E.D.N.Y. June 6, 2013), Dkt. No. 87 (extending the stay of litigation in plaintiff's district court litigation through September 1, 2013).

Plaintiff filed this action in the United States Court of Federal Claims (Court of Federal Claims) on December 5, 2012, see generally Compl., seeking $1,105,000,000 in

money damages, id. at 19.  Plaintiff also seeks costs, attorney's fees, interest and "[s]uch other and further relief as this honorable Court deems just and proper."  Id.

II.     Legal Standards

A.     Jurisdiction

1.     Ripeness

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985)).  The "'basic rationale [of the ripeness doctrine] is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'"  Thomas, 473 U.S. at 580 (internal quotation marks omitted). Determining whether claims are ripe for adjudication requires a court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  "As to the first prong, an action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'"  Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc. (Caraco), 527 F.3d 1278, 1295 (Fed. Cir. 2008) (alteration in original) (quoting Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 812 (2003), abrogated on other grounds by MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007)).  "As to the second prong, withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff."  Id. (quoting Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 171 (1967)).  "If a claim is not ripe, the court does not have jurisdiction to hear the case, and it must be dismissed without prejudice."  Bannum, Inc. v. United States, 56 Fed. Cl. 453, 462 (2003).

2.     The Indian Tucker Act and the Tucker Act

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  United States v. Sherwood, 312 U.S. 584, 586 (1941) (internal citations omitted).  The United States' consent to be sued by Indian tribes in the Court of Federal Claims is contained in the Indian Tucker Act, which provides as follows:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United

> States, or Executive orders of the President, or is one which otherwise
> would be cognizable in the Court of Federal Claims if the claimant were
> not an Indian tribe, band or group.

28 U.S.C. § 1505 (2006).  The final clause of the Indian Tucker Act alludes to the Tucker Act, "which waives immunity with respect to any claim 'founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.'"  United States v. Navajo Nation (Navajo II), 556 U.S. 287, 290 (2009) (quoting 28 U.S.C. § 1491(a)(1)).

"Although the Indian Tucker Act confers jurisdiction upon the Court of Federal Claims, it is not itself a source of substantive rights."  United States v. Navajo Nation (Navajo I), 537 U.S. 488, 503 (2003).  To invoke the court's jurisdiction, "a tribal plaintiff must invoke a rights-creating source of substantive law that 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'"  Id. (quoting United States v. Mitchell (Mitchell II), 463 U.S. 206, 218 (1983)).  This requires the tribe to clear "two hurdles."  Navajo II, 556 U.S. at 290.  First, the "[t]ribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties."  Navajo I, 537 U.S. at 506.  "If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'"  Id. (alterations in original) (quoting Mitchell II, 463 U.S. at 219).

3.      Motions to Dismiss for Lack of Jurisdiction

In considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), the court must accept as true all undisputed allegations of fact made by the non-moving party and draw all reasonable inferences from those facts in the non-moving party's favor.[3]  See Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  However, "[w]hen a party challenges the jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the pleadings to resolve the factual dispute."  Arakaki v. United States, 62 Fed. Cl. 244, 247 (2004) (citing, inter alia, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988)).  The

---

[3]The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP).  See RCFC 2002 rules committee note ("[I]nterpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the [FRCP].").  Rule 12 of the RCFC is substantially similar to Rule 12 of the FRCP.  Compare RCFC 12 with FRCP 12.  The court therefore relies on authority interpreting FRCP 12 as well as authority interpreting RCFC 12.

court may also consider undisputed facts contained in the record.  Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).  The burden is on the plaintiff to show jurisdiction by a preponderance of the evidence.  Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002).  If the court determines that it does not have jurisdiction, it must dismiss the claim.  See RCFC 12(h)(3).

B.    Motions to Amend Pleadings

With certain exceptions not applicable here, a party may amend a pleading only with the court's consent.  See RCFC 15(a)(1)-(2).  The court's rules state that "[t]he court should freely give leave [to amend a pleading] when justice so requires."  RCFC 15(a)(2).  However, leave should not be granted when amendment would be futile.  See Foman v. Davis, 371 U.S. 178, 182 (1962).[4]  "When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted . . . ."  Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V., 464 F.3d 1339, 1354-55 (Fed. Cir. 2006).

To state a claim on which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  See Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When determining whether a plaintiff has stated a claim upon which relief can be granted, the court "must accept as true all the factual allegations in the complaint" and make "all reasonable inferences in favor of the non-movant."  See Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001).  However, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.

III.    Discussion

In its Complaint, plaintiff pleads two claims for relief based on the district court's dismissal of its claims.  In claim one, plaintiff alleges that the district court violated trust obligations created by the Nonintercourse Act by failing to adjudicate the merits of plaintiff's claims.  See Compl. ¶¶ 57-62 (claim one) (stating that the government failed to meet its obligation to provide effective redress for the unlawful taking of Shinnecock land); see also Pl.'s Resp. 29 (stating that the district court was required by the government's trust obligations pursuant to the Nonintercourse Act to reach the merits of plaintiff's claims).  In claim two, plaintiff contends that the district court's dismissal of its claims violated its right to effective redress, pursuant to federal common law (informed by international law norms), for the loss of its land.  See Compl. ¶¶ 63-67 (claim two);

---

[4]Because the RCFC generally mirror the FRCP, see supra n.3, and because Rule 15 of the RCFC is substantially similar to Rule 15 of the FRCP, compare RCFC 15 with FRCP 15, the court relies on authority interpreting FRCP 15 as well as authority interpreting RCFC 15.

see also Pl.'s Resp. 35 (claiming that "federal common law (based on international law)" provides a mandatory right to compensation).

For the first time in its Response, plaintiff asserts a third claim for relief, characterizing the district court's actions as a "judicial taking." See Pl.'s Resp. 1; id. at 16 ("Plaintiff is challenging a 'judicial taking' occasioned by dismissal and entry of final judgment against Plaintiff on its Non-Intercourse Act land claim."). Plaintiff acknowledges that its Complaint did not "expressly enumerate a Fifth Amendment 'Takings' claim among its 'Claims for Relief,'" but requests that, if the court grants defendant's Motion, dismissal of plaintiff's Complaint "be without prejudice, with leave to amend." Id. at 2 n.2. The court construes plaintiff's request as a motion for leave to amend its Complaint to add a third claim for relief.

Defendant moves for dismissal of plaintiff's claim one and claim two on two jurisdictional grounds. First, defendant argues, "Plaintiff's Complaint does not present ripe claims," Def.'s Mot. 11, because plaintiff filed a motion for reconsideration and appeal, both of which remain pending, see id. at 10, 18. Second, defendant asserts, the court lacks jurisdiction over plaintiff's claim one and claim two because claims based on the Nonintercourse Act and federal common law are not within the waiver of sovereign immunity created by the Tucker Act and the Indian Tucker Act. Id. at 16-18. With respect to plaintiff's request to amend its Complaint, defendant contends that amendment should not be permitted because it would be futile. See Def.'s Reply 6.

The court addresses defendant's ripeness argument in Part III.A and defendant's sovereign immunity argument in Part III.B. In Part III.C, the court addresses plaintiff's request to amend its Complaint to add a judicial takings claim.

A.      Plaintiff's Claim One and Claim Two Are Not Ripe for Adjudication

Defendant describes plaintiff's "main argument" as being "that [the district court's decision] to dismiss their Non-Intercourse Act claims against New York denies them effective redress for such claims." Def.'s Mot. 10 (internal quotation marks omitted); see also Compl. ¶¶ 57-67 (claim one and claim two) (premising plaintiff's claims for relief on the government's obligation to provide plaintiff "effective redress"). Defendant notes that plaintiff has filed a motion for reconsideration and an appeal of the district court's decision, both of which remain pending. See Def.'s Mot. 10, 18. Because the district court could reconsider its dismissal of plaintiff's claims and because the dismissal could be reversed on appeal, defendant contends that plaintiff's claims "may never need to be decided in this forum." See id.

In its Response, plaintiff agrees that "litigation of the [Shinnecock] Nation's land claim has not run its entire course" but contends that plaintiff's claims in this case are nonetheless ripe for adjudication because the district court's judgment has an "immediate" preclusive effect. Pl.'s Resp. 15-16. Therefore, plaintiff states, "[i]t is only

the possibility of reversal of final judgment [rather than the events upon which plaintiff's claims rest] that is contingent." Id. at 16.  Plaintiff also contends that "withholding court consideration would cause hardship to Plaintiff because the complained-of conduct has an immediate and substantial impact on the plaintiff," but plaintiff does not further describe the nature of the purported "immediate and substantial impact."  See id. (internal quotation marks omitted).

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  Texas, 523 U.S. at 300 (internal quotation marks omitted).  To determine whether plaintiff's claims are ripe, the court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Cf. Abbot Labs., 387 U.S. at 149.  "As to the first prong, an action is fit for judicial review where further factual development would not significantly advance [a court's] ability to deal with the legal issues presented."  Caraco, 527 F.3d at 1295 (alteration in original) (internal quotation marks omitted).  Here, further factual development would significantly advance the court's ability to deal with the issues presented by plaintiff's claims.  Cf. id.  As the parties agree, plaintiff's district court litigation is still pending.  See Pl.'s Resp. 15; Def.'s Mot. 10.  The district court has dismissed plaintiff's claims, see Dist. Ct. Op. 2, but could grant plaintiff's motion for reconsideration or be reversed on appeal.  Accordingly, the court cannot assess plaintiff's claim that it has been denied "effective redress" in the district court litigation while that litigation and a related appeal are still underway.  Therefore, the first prong of the Abbot Laboratories test suggests that plaintiff's claims are not ripe for adjudication.  Cf. Abbot Labs., 387 U.S. at 149 (requiring that the court first evaluate "the fitness of the issues for judicial decision").

"As to the second prong, withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an immediate and substantial impact on the plaintiff."  Caraco, 527 F.3d at 1295 (internal quotation marks omitted).  Plaintiff cites this standard, see Pl.'s Resp. 15, but does not describe how denying consideration of this action would have an immediate and substantial impact on plaintiff.  In fact, the presence of such an impact is belied by plaintiff's delay in pursuing its claims in the district court litigation.  According to the allegations in plaintiff's Complaint, the jurisdictional impediments that prevented plaintiff from bringing its claims in federal court were eliminated in 1974.  See Compl. ¶ 39.  Yet, plaintiff did not file the district court litigation until 2005, id. ¶ 46, more than thirty years later.  In light of this unexplained delay and plaintiff's failure to explain how withholding court consideration would cause "an immediate and substantial impact on . . . plaintiff," the court concludes that withholding consideration until the conclusion of plaintiff's district court litigation (including any related appeals) would not cause a significant hardship to plaintiff.  Cf. Caraco, 527 F.3d at 1295 (internal quotation marks omitted).  Therefore, the second prong of the Abbot Laboratories test also suggests that plaintiff's claims are not

ripe for adjudication.  Cf. Abbot Labs, 387 U.S. at 149 (requiring the court to evaluate "the hardship to the parties of withholding court consideration").

Accordingly, the court concludes that plaintiff's claims are not ripe for adjudication, cf. id. (describing the test for ripeness), and must be dismissed for lack of jurisdiction, cf. Bannum, Inc., 56 Fed. Cl. at 462 (stating that a claim that is not ripe must be dismissed for lack of jurisdiction).  Defendant's Motion is GRANTED insofar as defendant requests dismissal on this ground.

B.     Even if Plaintiff's Claims Were Ripe for Adjudication, the Court Lacks Jurisdiction over Plaintiff's Nonintercourse Act and Federal Common Law Claims on Other Grounds

1.     Claim One:  The Nonintercourse Act

Plaintiff's claim one is based on the government's alleged obligations under the Nonintercourse Act.  See Compl. ¶¶ 57-62 (claim one).  Plaintiff contends that the Nonintercourse Act created a trust relationship between plaintiff and the government, a relationship which entails fiduciary obligations for the government, see Pl.'s Resp. 25 ("'That the Nonintercourse Act imposes upon the federal government a fiduciary's role with respect to protection of the lands of a tribe covered by the Act seems to us beyond question . . . .'" (emphasis omitted) (quoting Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 379 (1st Cir. 1975))), and further contends that this court's predecessor has found a breach of these fiduciary obligations "to be compensable by an award of damages," see id. at 27 (citing Seneca Nation of Indians v. United States, 173 Ct. Cl. 917, 925-26 (1965)).  Plaintiff "submits that the fiduciary obligation of the United States is broad enough to apply to the judicial branch as well as the legislative and executive branches," id. at 28, requiring the district court to have addressed plaintiff's claims on their merits, id. at 29.

Defendant contends that the court lacks jurisdiction over plaintiff's claim one, Def.'s Mot. 1-2, because the Nonintercourse Act "does not set forth a specific, enforceable mandatory trust duty" and cannot "be fairly interpreted as mandating compensation," id. at 19 (emphasis and some capitalization omitted); Def.'s Reply 13 (same).  Instead, defendant maintains, "[t]he Non-Intercourse Act creates a discretionary general trust duty that permits enforcement of its provisions."  Def.'s Reply 14 (emphasis added).  Defendant further contends that, "[r]egardless of whether there are specific duties in the Non-Intercourse Act, the Act in no way prohibits a federal district court from dismissing a case" and "does not remove defenses or mandate that a federal district court must hear a case brought under it on the merits."  Id. at 15.

With respect to claim one, plaintiff has failed to "identify a substantive source of law that establishes specific fiduciary or other duties" and to "allege that the Government has failed faithfully to perform those duties."  Cf. Navajo I, 537 U.S. at 506 (emphasis

11

added).  For example, <u>Joint Tribal Council of the Passamaquoddy Tribe</u>, relied upon by plaintiff in support of its argument that the Nonintercourse Act is substantive source of law establishing specific fiduciary duties, <u>see</u> Pl.'s Resp. 25-26, 28, expressly states that "it would be inappropriate to attempt to spell out what duties are imposed by the trust relationship" created by the Nonintercourse Act, <u>Joint Tribal Council of the Passamaquoddy Tribe</u>, 528 F.2d at 379.[5]  Similarly, <u>Seneca Nation of Indians</u> and other Indian Claims Commission Act cases relied upon by plaintiff, <u>see</u> Pl.'s Resp. 25-27, fail to support plaintiff's argument because they deal with liability under the Nonintercourse Act in conjunction with the Indian Claims Commission Act, which is not applicable here, and, specifically, with the duty not to allow receipt of unconscionably low consideration for Indian lands, <u>cf.</u> <u>Seneca Nation of Indians</u>, 173 Ct. Cl. at 925-26 ("[W]herever [the Nonintercourse Act] applies the United States is liable, under the Indian Claims Commission Act, for the receipt by the Indians of an unconscionably low consideration.").

Moreover, to the extent that the Nonintercourse Act, standing alone, may create specific fiduciary duties, <u>see, e.g.</u>, <u>id.</u> at 925 (stating that the federal government's responsibility under the Nonintercourse Act includes "be[ing] present at [tribal land] negotiations," prevention of "actual fraud, deception, or duress" with respect to tribal land transactions, and related concerns regarding "improvidence, unfairness, [and] the receipt of an unconscionable consideration"), plaintiff has not persuaded the court that the Nonintercourse Act gives rise to any specific fiduciary duties that are applicable to the judiciary and that would serve as a basis for requiring the district court to adjudicate plaintiff's claims on the merits.  Plaintiff "submits that the fiduciary obligation of the United States is broad enough to apply to the judicial branch as well as the legislative and executive branches," Pl.'s Resp. 28, but does not explain why this is the case, describe how such a fiduciary obligation would function (beyond requiring the district court to reject equitable defenses to plaintiff's claims) or cite any authority in support of its position.  And nothing in the plain language of the Nonintercourse Act suggests that any trust relationship would extend to the judicial branch and function to bar equitable defenses from the adjudication of Nonintercourse Act claims.

The court therefore concludes that plaintiff's claim one, which is based on the Nonintercourse Act, does not "invoke a rights-creating source of substantive law that can fairly be interpreted as mandating compensation by the Federal Government for the

---

[5]The court also notes that <u>Joint Tribal Council of the Passamaquoddy Tribe v. Morton</u>, 528 F.2d 370 (1st Cir. 1975), in addition to being nonbinding on the court, was decided in 1975-- that is, before the United States Supreme Court articulated the current standard for recovering under the Indian Tucker Act based on a breach of fiduciary duty, <u>see, e.g.</u>, <u>United States v. Navajo Nation</u>, 537 U.S. 488 (2003) (stating as the threshold requirement under the current standard that a tribal plaintiff "must identify a substantive source of law that establishes <u>specific</u> fiduciary or other duties" (emphasis added)).

damages sustained," and must be dismissed for lack of jurisdiction. Cf. Navajo I, 537 U.S. at 503 (internal quotation marks omitted). Defendant's Motion is GRANTED insofar as defendant requests dismissal of plaintiff's claim one on this ground.

2.     Claim Two:  Federal Common Law Right to Redress

Plaintiff's claim two is that the district court's dismissal of its claims violated its right to effective redress, pursuant to federal common law (informed by international law norms), for the loss of its land. See Compl. ¶¶ 63-67 (claim two); id. ¶¶ 26-30 (citing, inter alia, United Nations Declaration on the Rights of Indigenous Peoples (U.N. Declaration or U.N. Decl.), G.A. Res. 61/295, U.N. Doc. A/RES/61/295 (Sept. 13, 2007)); Pl.'s Resp. 32 (stating that the U.N. Declaration is "an important and authoritative articulation of the broad and perhaps universal global consensus of the application of the broader international Human Rights norms in the specific context of the world's indigenous peoples, including Plaintiff"). Plaintiff contends that "[t]he universal (or near universal) global consensus . . . is that '[i]ndigenous peoples have the right to redress . . . for the lands, territories [and] resources . . . which have been confiscated, taken, [occupied], used or damaged without their free, prior and informed consent.'" Pl.'s Resp. 35 (third omission in original) (quoting U.N. Decl. art. 28, ¶ 1).

Included in the Indian Tucker Act's jurisdictional grant is the power to decide claims "which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group," 28 U.S.C. § 1505, that is, claims that could otherwise be brought under the Tucker Act, Navajo II, 556 U.S. at 290. Plaintiff contends that its federal common law claim is such a claim. See Pl.'s Resp. 29 (referring to the Tucker Act's grant of jurisdiction).

However, plaintiff "does not claim" that the sources of international law that it cites "constitute . . . money-mandating source[s] of law sufficient to provide a basis for jurisdiction under the Tucker Act." Id. at 32; see also id. ("United Nations declarations generally do not in and of themselves have any binding force . . . ."). Instead, plaintiff relies on the portion of the Tucker Act that grants the court jurisdiction over claims "'for liquidated or unliquidated damages in cases not sounding in tort,'" see id. at 29-30 (quoting 28 U.S.C. § 1491(a)(1)), which plaintiff contends "'has never been fully and authoritatively construed,'" id. at 29 (quoting Cape Fox Corp. v. United States, 4 Cl. Ct. 223, 230 (1983)). Without citation to authority, plaintiff appears to take the position that this portion of the Tucker Act should be read as enlarging the Tucker Act's waiver of sovereign immunity beyond claims founded on the Constitution, statutes, regulations and contracts to claims based on federal common law which, plaintiff maintains, may be informed by international law. See id. at 35 (claiming "that federal common law (based on international law) provides a right to compensation itself" and "that such common law-based right to compensation is mandatory by its terms"). Plaintiff appears to contend that the district court violated the government's obligation under federal common law (informed by international law norms) to provide effective redress to plaintiff for the

13

taking of its land.  See id. at 31 ("[T]he obligation[s] of the United States under customary international law [are] broad enough to apply to the judicial branch as well as the legislative and executive branches."); id. at 35 ("The universal (or near universal) global consensus . . . is that '[i]ndigenous peoples have the right to redress . . . for the lands, territories [and] resources . . . which have been confiscated, taken, [occupied], used or damaged without their free, prior and informed consent.'" (third omission in original) (quoting U.N. Decl. art. 28, ¶ 1)); see also Compl. ¶¶ 63-67 (claim two).

Defendant responds that "the text of [the Tucker Act and the Indian Tucker Act] plainly does not waive sovereign immunity from claims arising under 'common law' principles" and that "[o]nly Congress . . . can . . . waive sovereign immunity under the Indian Tucker Act."  Def.'s Reply 16.

Defendant is correct:  "Common law causes of action . . . are not included in [the Tucker Act's] jurisdictional grant."  Ramirez v. United States, 36 Fed. Cl. 467, 472 (1996).  Although the portion of the Tucker Act relied upon by plaintiff has, in fact, "never been fully and authoritatively construed," Mitchell v. United States, 229 Ct. Cl. 1, 9 n.7, 664 F.2d 265, 270 n.7 (1981) (en banc), aff'd, Mitchell II, 463 U.S. 206, it does not waive sovereign immunity for claims based on federal common law principles, cf. United States v. King, 395 U.S. 1, 4 (1969) (stating that waivers of sovereign immunity "cannot be implied but must be unequivocally expressed").  Waivers of sovereign immunity, such as the Tucker Act, "must be construed strictly in favor of the sovereign and not enlarge[d] . . . beyond what the language requires."  United States v. Nordic Vill., Inc., 503 U.S. 30, 34 (1992) (alteration and omission in original) (internal citation and quotation marks omitted).

The language of the Tucker Act does not mention federal common law claims.  The Tucker Act waives sovereign immunity specifically with respect to "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The court may not imply a waiver of sovereign immunity with respect to federal common law claims, cf. King, 395 U.S. at 4 (stating that waivers of sovereign immunity "cannot be implied but must be unequivocally expressed"), or accommodate such claims by enlarging the waiver contained in the Tucker Act "beyond what the language requires," cf. Nordic Vill., Inc., 503 U.S. at 34 (internal quotation marks omitted).

Because the Tucker Act does not grant the Court of Federal Claims jurisdiction over claims against the United States based on federal common law, plaintiff's claim two is not a claim "which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group."  Cf. 28 U.S.C. § 1505; Navajo II, 556 U.S. at 290 (stating that this provision of the Indian Tucker Act alludes to claims that could be brought under the Tucker Act).  Because plaintiff has not "invoke[d] a rights-

creating source of substantive law that can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained" for purposes of the Indian Tucker Act, plaintiff's claim two must be dismissed for lack of jurisdiction. Cf. Navajo I, 537 U.S. at 503 (internal quotation marks omitted).  Defendant's Motion is GRANTED insofar as defendant requests dismissal of plaintiff's claim two on this ground.

> C.    Amendment of Plaintiff's Complaint to Add a Judicial Takings Claim Would Be Futile

The court has construed plaintiff's request that, if the court grants defendant's Motion, dismissal of plaintiff's Complaint "be without prejudice, with leave to amend," see Pl.'s Resp. 2 n.2, as a motion to amend the Complaint.  Plaintiff seeks leave to add a claim for relief characterizing the district court's actions as a "judicial taking," see id. at 18-23 (discussing judicial takings claim), a claim for relief that plaintiff acknowledges was not "expressly enumerate[d]" in its Complaint, id. at 2 n.2.  Plaintiff contends that the district court effected a judicial taking by dismissing its claims on the basis of equitable defenses and by entering judgment.  Id. at 1; see id. at 16 ("Plaintiff is challenging a 'judicial taking' occasioned by dismissal and entry of final judgment against Plaintiff on its Non-Intercourse Act land claim.").  Plaintiff contends that "'claims for compensation are property interests that cannot be taken for public use without compensation.'"  Id. at 18 (quoting In re Aircrash in Bali, Indon. on Apr. 22, 1974, 684 F.2d 1301, 1312 (9th Cir. 1982)).

With certain exceptions not applicable here, a party may amend a pleading only with the court's consent.  See RCFC 15(a)(1)-(2).  The court's rules state that "[t]he court should freely give leave [to amend a pleading] when justice so requires."  RCFC 15(a)(2).  However, leave should not be granted when amendment would be futile.  See Foman, 371 U.S. at 182.  "When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted . . . ."  Kemin Foods, L.C., 464 F.3d at 1354-55.  Therefore, whether plaintiff should be permitted to amend its Complaint to specifically include a judicial takings claim depends on whether such a complaint would state a claim on which relief could be granted.  Cf. id.

Defendant contends that plaintiff's judicial takings argument is unavailing because "Plaintiff has not set forth a compensable property interest that could be taken."  Def.'s Reply 9.  Defendant maintains that "a cause of action against the government is not a property interest protected by the Fifth Amendment's takings clause."  Id. at 10 (citing Sharkey v. United States, 17 Cl. Ct. 643, 648 (1989)).  Furthermore, defendant argues, "[a]lthough a cause of action is 'a species of property protected by the Fourteenth Amendment's Due Process Clause,'" id. (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982)), "'a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained,'" id. at 10 n.1 (quoting Bowers v. Whitman,

671 F.3d 905, 914 (9th Cir.), cert. denied sub nom. Bruner v. Whitman, 133 S. Ct. 163 (2012)); see also id. at 10 (stating that "Plaintiff did not have a vested interest or a guarantee that its Non-Intercourse Act claim would proceed on the merits" because "[one] of the background principles that shape any expectation with respect to bringing a case is that it may be subject to a defense").

Defendant further contends that, even if plaintiff had identified a valid property interest, applying the judicial takings "theory" as the rule of decision in this case would be inappropriate.[6] See id. at 7. Defendant argues that "'[t]he constitutional obligation not to take property does not fall equally on all branches,'" id. (quoting Brace v. United States, 72 Fed. Cl. 337, 359 (2006)), aff'd per curiam, 250 F. App'x 359 (Fed. Cir. 2007) (unpublished), because "[c]ourts do not 'make' the law, or fabricate it from whole cloth; courts interpret the law," Def.'s Reply 7. Accordingly, defendant contends, the judiciary's "conclusions regarding the law" should be treated "differently from those of the legislature or the executive," and "judicial decisions are not similar enough to legislative or executive actions that take property" to justify application of a judicial takings theory. Id.

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. To prevail on a takings claim, a property owner must satisfy a two-part test. See Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004). "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." Id. This is because "'only persons with a valid property interest at the time of the taking are entitled to compensation.'" Id. (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001)). "Second, after having identified a valid property interest, the court must

---

[6]Defendant also contends that, to the extent that plaintiff is attempting (by characterizing its claim as one for a "judicial taking") to relitigate the merits of the claims it brought before the United States District Court for the Eastern District of New York (the district court), "this Court lacks subject-matter jurisdiction to scrutinize the decisions of other federal courts." United States' Reply in Supp. of Mot. to Dismiss, Dkt. No. 13, at 8. Defendant argues that, if plaintiff disagrees with the merits of the district court's decision and the binding precedent the district court applied, plaintiff must file an appeal with the United States Supreme Court. Id.

Defendant is correct that the court does not have jurisdiction to consider a takings claim that merely asserts that another court committed an error of law. Cf. Vereda, Ltda. v. United States, 271 F.3d 1367, 1375 (Fed. Cir. 2001) ("[T]he [United States] Court of Federal Claims cannot entertain a taking claim that requires the court to 'scrutinize the actions of' another tribunal." (quoting Allustiarte v. United States, 256 F.3d 1349, 1352 (Fed. Cir. 2001))). Therefore, to the extent that plaintiff, by asserting a taking claim, is asserting that the district committed an error of law, this court lacks jurisdiction to consider such an argument. Cf. Vereda, Ltda., 271 F.3d at 1375.

determine whether the governmental action at issue amounted to a compensable taking of that property interest." Id.

"[T]he Constitution does not itself create or define the scope of 'property' interests protected by the Fifth Amendment." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005). "'Instead, existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking.'" Id. (quoting Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003)). "The concept of property for purposes of the fifth amendment has been interpreted broadly and can include every sort of interest the citizen may possess." Shanghai Power Co. v. United States, 4 Cl. Ct. 237, 240 (1983) (internal quotation marks omitted), aff'd, 756 F.2d 159 (Fed. Cir. 1985) (unpublished table decision).

Defendant's contention that "a cause of action against the government is not a property interest protected by the Fifth Amendment's takings clause," Def.'s Reply 10, is beside the point. Plaintiff's action in the district court did not name the United States as a defendant. See First Am. Compl. at 1, Shinnecock Indian Nation v. New York, No. 05-CV-2887 (TCP) (E.D.N.Y. Aug. 5, 2005), Dkt. No. 5 (listing the defendants in plaintiff's district court litigation). It is therefore not plaintiff's view that it has been deprived of a cause of action against the United States. Defendant is correct, however, see Def.'s Reply 10, that, for the reasons stated below, plaintiff has not identified a valid property interest for purposes of the Takings Clause, cf. Am. Pelagic Fishing Co., 379 F.3d at 1372 ("First, . . . the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment.").

The "Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.'" Landgraf v. USI Film Prods., 511 U.S. 244, 266 (1994) (emphasis added); cf., e.g., Yankee Atomic Electric Co. v. United States, 112 F.3d 1569, 1580 n.8 (Fed. Cir. 1997) (rejecting the plaintiff's takings claim because the plaintiff lacked a vested property right). For purposes of the Takings Clause, "no 'vested' right [in a cause of action] attaches until there is a final, unreviewable judgment."[7] Rogers v. Tristar Prods., Inc., Nos. 2011-1494 and 2011-1495, 2012 WL

---

[7]The same is true in the context of the Due Process Clause. See In re TMI, 89 F.3d 1106, 1113 (3d Cir. 1996) (stating that "a pending tort claim does not constitute a vested right"); Sowell v. Am. Cynamid Co., 888 F.2d 802, 805 (11th Cir. 1989) ("[A] legal claim affords no definite or enforcible [sic] property right until reduced to final judgment."); Austin v. City of Bisbee, 855 F.2d 1429, 1435-36 (9th Cir. 1988) (stating that "[a] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause," but that "it is inchoate and affords no definite or enforceable property right until reduced to final judgment" (internal quotation marks omitted)); Hammond v. United States, 786 F.2d 8, 12 (1st Cir. 1986) ("'No

1660604, at *2 (Fed. Cir. May 2, 2012) (per curiam) (unpublished); see also Hammond v. United States, 786 F.2d 8, 12 (1st Cir. 1986) (citing United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 110 (1801)) (stating same).  But see Abrahim-Youri v. United States, 139 F.3d 1462, 1465 (Fed. Cir. 1997) (suggesting in dicta that the plaintiffs had cognizable property interests in pending claims against the Iranian government).  This is because, until a final unreviewable judgment has been entered, the cause of action "is inchoate and does not provide a certain expectation in that property interest."  Bowers, 671 F.3d at 914.  Therefore, because plaintiff has not secured a final unreviewable judgment in its favor on its Nonintercourse Act claim, plaintiff's interest in its Nonintercourse Act claim has not vested and is not protected by the Takings Clause.  Cf. Landgraf, 511 U.S. at 266; Rogers, 2012 WL 1660604, at *2.

Plaintiff also fails to meet the second part of the test applied to takings claims by identifying a government action that amounts to a taking.  Cf. Am. Pelagic Fishing Co., 379 F.3d at 1372 ("Second, . . . the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.").  Significantly, plaintiff's takings claim relies entirely on a theory of judicial takings that has not been adopted in the federal courts.  See Brace v. United States, 72 Fed. Cl. 337, 358-59 (2006) ("Generally speaking, court orders have never been viewed themselves as independently giving rise to a taking."), aff'd per curiam, 250 F. App'x 359 (Fed. Cir. 2007) (unpublished).  The theory of judicial takings, as explained in Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot. (Stop the Beach), 130 S. Ct. 2592, 2602 (2010), posits that "the Takings Clause bars the State from taking private property without paying for it, no matter which branch is the instrument of the taking."  Stop the Beach, 130 S. Ct. at 2602 (plurality opinion) (emphasis omitted).  Accordingly, "If a legislature or a court declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation."  Id.; see also Smith v. United States, 709 F.3d 1114, 1116-17 (Fed. Cir. 2013) (characterizing the plurality opinion in Stop the Beach as "recogniz[ing] that a takings claim [could] be based on the action of a court" and noting that, prior to Stop the Beach, academic discussion recognized "that judicial action could constitute a taking of property" (citing Barton H. Thompson, Jr., Judicial Takings, 76 Va. L. Rev. 1449 (1990)).

However, the portion of the Supreme Court's decision in Stop the Beach that discussed the standard for finding that a judicial taking had occurred and stated that a judicial taking was a valid cause of action was signed by only four justices, see Stop the Beach, 130 S. Ct. at 2597, 2601-10 (plurality opinion), and therefore did not create binding precedent, accord Burton v. Am. Cyanamid Co., 775 F. Supp. 2d 1093, 1099

---

person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit.'  This is true after suit has been filed and continues to be true until a final, unreviewable judgment is obtained." (internal citations omitted) (quoting N.Y. Cent. R.R. v. White, 243 U.S. 188, 198 (1917)).

(E.D. Wis. 2011) ("In [Stop the Beach], four justices supported [the idea that there can be a judicial taking], not enough to establish a binding precedent").  The four other justices participating in the decision of the case--Justice Kennedy (joined by Justice Sotomayor) and Justice Breyer (joined by Justice Ginsburg)--did not join this portion of the opinion and wrote that it was unnecessary to determine whether the actions of a court could effect a taking.[8]  Stop the Beach, 130 S. Ct. at 2613 (Kennedy, J., concurring in part) (stating that "this case does not require the Court to determine whether, or when, a judicial decision determining the rights of property owners can violate the Takings Clause"); id. at 2619 (Breyer, J., concurring in part) ("There is no need now to decide more than . . . that the Florida Supreme Court's decision in this case did not amount to a 'judicial taking.'").  Accordingly, the plurality portion of the Court's opinion is not binding precedent.  Cf. Texas v. Brown, 460 U.S. 730, 737 (1983) (stating that a position not adopted by a majority of the deciding justices is not binding precedent).

     In another case addressing judicial takings, Hughes v. Washington, 389 U.S. 290 (1967), the Supreme Court considered the effect on landowners of the Washington Supreme Court's reversal of its longstanding position that land accreting along the edge of riparian property belonged to the owner of the adjoining property instead of to the state.  Hughes, 389 U.S. at 290-96.  In a concurring opinion, Justice Stewart, noting that the change in Washington's property law was "unforeseeable," wrote that, "[a]lthough the State in this case made no attempt to take the accreted lands by eminent domain, it achieved the same result by effecting a retroactive transformation of private into public property--without paying for the privilege of doing so."  Id. at 297-98 (Stewart, J., concurring).  "[T]he Due Process Clause of the Fourteenth Amendment," Justice Stewart continued, "forbids such confiscation by a State, no less through its courts than through its legislature."  Id. at 298.  However, Justice Stewart's concurrence in Hughes, which argued that a judicial taking had occurred, has not been followed by a majority of the United States Supreme Court.  See Brace, 72 Fed. Cl. at 359 n.35 (quoting W. David Sarratt, Judicial Takings and the Course Pursued, 90 Va. L. Rev. 1487, 1510 (2004) (stating that "Justice Stewart's concurrence [in Hughes] 'has never been followed by a majority of the Court, and the Court has since declined offers to take up the issue again'")).

     Indeed, plaintiff cites no case in which a property owner prevailed on a judicial takings claim, and the cases plaintiff relies upon in addition to Stop the Beach and Hughes, see Pl.'s Resp. 19, 21-23, do not support plaintiff's position.  For example, in Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 37 (2012), the Court of Federal Claims ruled only that the plaintiff's judicial takings claim was not barred by a jurisdictional statute not relevant here.  See Petro-Hunt, 105 Fed. Cl. at 44-45.  Robinson v. Ariyoshi, 753 F.2d 1468 (9th Cir. 1985), was later vacated by the Supreme Court.  Ariyoshi v.

---

[8]Justice Stevens did not participate in deciding the case.  Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 130 S. Ct. 2592, 2613 (2010).

Robinson, 477 U.S. 902, 902 (1986); cf. Brace, 72 Fed. Cl. at 359 n.35 (stating that Robinson was the only example the court could identify of any court finding a judicial taking and that it had been vacated).  Finally, in Ultimate Sports Bar, Inc. v. United States, 48 Fed. Cl. 540 (2001), the Court of Federal Claims stated that "[a] judicial taking occurs where a court's decision that does not even 'arguably conform[] to reasonable expectations' in terms of relevant law of property rights effects a 'retroactive transformation of private into public property.'"  Ultimate Sports Bar, Inc., 48 Fed. Cl. at 550 (alteration in original) (quoting Hughes, 389 U.S. at 296, 298 (Stewart. J., concurring)).  This statement, however, was dicta in that it only clarified that the court had not "intended to preclude [judicial takings] claims from being cognizable in this tribunal in the future."  See id.

As Justice Kennedy noted in his concurring opinion in Stop the Beach, judicial alteration of established property rights has traditionally--and "'more appropriate[ly]'"--been examined under a due process framework.  Stop the Beach, 130 S. Ct. at 2614 (Kennedy, J., concurring) (quoting E. Enters. v. Apfel, 524 U.S. 498, 545 (1998) (Kennedy, J., concurring)).  Adopting a judicial takings framework would require courts to resolve "certain difficulties," including that, "as a matter of custom and practice," it has been the role of the legislative and executive branches to decide what property to condemn.  Id. at 2613-14.  In fact, based on the text of the Fifth Amendment and on the case law interpreting the Takings Clause, it is not clear that courts have the same power as the legislative and executive branches to take private property for public use.  See id. at 2614 ("When courts act without direction from the executive or legislature, they may not have the power to eliminate established property rights by judicial decision.").

Further, even if a judicial takings theory were a viable basis for a cause of action in this court, the district court's actions do not resemble the judicial action at issue in Hughes or Stop the Beach.  In both Hughes and Stop the Beach, the issue was whether court decisions held that that established property rights no longer existed, thereby turning private property into public property.  See Stop the Beach, 130 S. Ct. at 2610 (describing the plaintiff's contention that a decision by the Florida Supreme Court deprived her of the established right to littoral accretions and to have her property touch the water); Hughes, 389 U.S. at 294-95 (Stewart, J. concurring) (describing the Washington Supreme Court's holding that oceanfront accretions belong to the state).  In this case, the district court made no change in substantive property law and merely ruled that, under binding precedent established in other cases, equitable defenses were available and warranted dismissal of plaintiff's claim.  See Dist. Ct. Op. 2; cf. In re Lazy Days' RV Ctr. Inc., No. 12-4047, 2013 WL 3886735, at *6 (3d Cir. July 30, 2013) (stating, in the context of bankruptcy that, pursuant to Stop the Beach, the "adjudication of disputed and competing claims cannot be a taking").

For the reasons stated, plaintiff has failed to identify a valid property interest or a government action that amounts to a taking of that property interest, and it would

therefore be futile for plaintiff to amend its complaint to add a judicial taking claim.  Cf. Kemin Foods, L.C., 464 F.3d at 1354-55 (stating that amendment should be denied on the ground of futility when the proposed pleading does not state a claim upon which relief can be granted); Am. Pelagic Fishing Co., 379 F.3d at 1372 (stating that, to prevail on a takings claim, a plaintiff must identify a valid property interest and a government action that amounts to a taking of that property interest).  Plaintiff's request to amend its Complaint is therefore DENIED.

IV.      Conclusion

For the foregoing reasons, the court concludes that plaintiff's claim one and claim two are not ripe, see supra Part III.A, and, even if they were, that they are not otherwise within the jurisdiction of the Court of Federal Claims, see supra Part III.B.  Defendant's Motion is therefore GRANTED.  The Clerk of Court shall ENTER JUDGMENT for defendant, dismissing plaintiff's Complaint.

Plaintiff's request to amend its Complaint to add a third claim for relief, construed as a motion to amend plaintiff's Complaint, would be futile and is therefore DENIED. See supra Part III.C.

No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge
